UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

In re:

ANDREA T. McBRIDE,

Debtor.

Chapter 11
Case No. 23-20168

## ORDER DENYING CONFIRMATION

The matter before the Court concerns the confirmation of debtor Andrea T. McBride's amended plan of reorganization. Following the Court's review of the amended plan, the objections and comments of various parties, and the arguments presented at an October 31, 2023 hearing, the Court denies confirmation of the plan because: (i) Ms. McBride did not provide sufficient information to allow the Court or creditors to determine her disposable income for purposes of 11 U.S.C. § 1191(c)(2)(B); and (ii) the plan does not provide appropriate remedies in accordance with 11 U.S.C § 1191(c)(3).

### I.    Background

Andrea McBride (the "Debtor") is a dentist who owns Maplewood Dental Practice in Gorham, Maine. She acquired her dental practice pre-petition through a professional corporation registered with the State of Maine under the name Andrea T. McBride, DMD PA (the "PA"). Sometime prior to August 9, 2023 (the "Petition Date"), the Debtor caused the PA to transfer its assets to her, individually, and she assumed the PA's liabilities; most of which she had personally guaranteed. She then filed a voluntary petition for relief under Subchapter V of Chapter 11 of the United States Bankruptcy Code.

Along with her petition, the Debtor filed a Plan of Reorganization Dated August 9, 2023 at Docket Entry ("D.E.") 3 (the "Original Plan"). On October 5, 2023, Live Oak Banking Company ("Live Oak") filed an objection to confirmation of the Original Plan (D.E. 103). Five days later, the Debtor filed Debtor's First Amended Plan of Reorganization Dated October 10, 2023 (D.E. 107) (the "Amended Plan"). Live Oak then withdrew its objection (D.E. 116), but Patterson Dental Supply, Inc. ("Patterson")

filed its own objection to confirmation on October 16, 2023 (D.E. 118).[1] The Debtor responded to the Patterson objection on October 27, 2023 (D.E. 124). On October 31, 2023, the Court heard oral argument from the Debtor, Patterson, and the United States Trustee's office, which filed a comment echoing many of Patterson's concerns. Following that hearing, the Court took the matter under advisement.

In the Amended Plan, the Debtor separates claims into six different classes. Class One consists of the Allowed Secured Claim of Patterson in the amount of $214,400.00 or, in the alternative, "at the option of the Debtor . . . in such amount as the Debtor and Patterson Dental Supply, Inc. may agree upon in writing . . ."[2] Amended Plan, §3.1. Class Two consists of the Allowed Secured Claim of KeyBank N.A. in the amount of $200,335.07. Id., § 3.2. Class Three consists of all Allowed Claims of Live Oak, which are comprised of ". . . an indebtedness arising from a guaranty of the Debtor of an obligation of Madison VWB Realty, LLC ('Madison'), a Maine limited liability company of which the Debtor owns 90% of the membership interests." Id., § 3.3. According to § 3.3 of the Amended Plan, the Class Three claim is secured by real estate owned by Madison. Classes Four and Five consist of claims secured by mortgages on a residence and a camp, respectively; both of which are owned jointly with the Debtor's non-filing spouse. Id., §§ 3.4, 3.5. Finally, Class Six consists of all general unsecured claims. Id., § 3.6.

The Amended Plan proposes the following treatment of the classes. Classes One and Two will be paid pursuant to promissory notes payable over eight years, in quarterly installments of principal and interest at a fixed annual rate of 8.5%. Amended Plan, §§ 4.1, 4.2. Class Three will retain its liens "in assets of the Debtor and assets of Madison VWB Realty, LLC . . ." Id., § 4.3. "Further, the Order confirming this Amended Plan shall constitute the reaffirmation by the Debtor of her obligations with

---

[1] Patterson filed its objection well after the October 3, 2023 deadline established in the Order Fixing Deadlines Under Interim Rule 3017.2 issued on August 10, 2023 (D.E. 18) but the filing was timely under an October 10, 2023 order which extended the deadline as to Patterson (D.E. 111).

[2] The Amended Plan capitalized the terms "Allowed Secured Claim" and "Allowed Claim". Although the capitalization suggests these are defined terms, the Amended Plan does not appear to include any such definition. For the avoidance of doubt, when the Court references a claim identified in the Amended Plan as an Allowed Secured Claim or Allowed Claim, the Court will also capitalize the term to evidence its intent to use the term in the same way the Debtor intends to use it.

2

respect to the Class Three Claim, provided however that the transfer of assets from the corporation, Andrea M. Taliento DMD PA, to the Debtor and commencement of Chapter 11 proceedings by the Debtor, while constituting events of default under the applicable loan documentation, the holder of the Class Three claim waives its rights to accelerate the loan for such non-monetary default and to seek other remedies for default, in exchange for the full payment of its Claim of $518,813.56." Id.  Classes Four (the claim secured by a mortgage on the residence) and Five (the claim secured by a mortgage on the camp) will be paid in accordance with the terms of the applicable loan documents.  Id., §§ 4.4, 4.5.  Holders of claims in Class Six will receive a pro rata share of $105,000.00.  Id., §§ 4.4, 4.5, 4.6.  Plan payments are to be funded by: "(a) Disposable income earned by the Debtor during the seven (7) year period commencing on the Effective Date; [and] (b) Distributions of cash available to the Debtor, including cash generated by profits and income from entities with respect to which the Debtor retains her equity interests."  Id., § 5.1.

The Debtor's Schedule D lists Patterson as holding a noncontingent, liquidated and undisputed claim in the amount of $475,284.69 which is secured by various dental equipment the Debtor valued—as of the Petition Date—at just $57,239.00 (D.E. 1).  The Original Plan recognized an Allowed Secured Claim held by Patterson in the amount of just $81,770.47 which represented the Debtor's post-petition determination of the fair market value of Patterson's collateral.  Original Plan, § 3.1.  Patterson's requests for extensions of the deadline for objecting to confirmation stated that Patterson and the Debtor attempted to negotiate a consensual resolution of Patterson's objections to the Original Plan.  Likely as a result of those efforts, the Debtor increased Patterson's Allowed Secured Claim to $214,000.00 in the Amended Plan.  Amended Plan, § 3.1.  If its secured claim is allowed in this amount, Patterson will have a general unsecured claim in the amount of $261,284.69.

Despite this change, Patterson still objected to the Amended Plan and voted against confirmation, both as the sole claimholder in Class One and as a significant claimholder in Class Six.  No other impaired creditors voted.

## II.    The Fair and Equitable Standard

Confirmation of a plan in a Subchapter V case is appropriate if all of the requirements of § 1129(a), other than paragraph (15), are satisfied.  11 U.S.C. § 1191(a).  Since Patterson, as the only creditor to cast a ballot, voted against confirmation both as the sole claimholder in Class One and a substantial claimholder in Class Six, §§ 1129(a)(8) and (10) are not satisfied.  As such, the Amended Plan can only be confirmed if the Court finds that it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1191(b).  The Rule of Construction in § 1191(c) states that ". . . the condition that a plan be fair and equitable with respect to each class of claims or interests *includes* . . ." the requirements set forth in subsections (1), (2), and (3).  11 U.S.C. § 1191(c) (emphasis supplied). The use of the word "includes" in § 1191(c) does not prevent a court from finding a plan to be unfair and inequitable even if it satisfies those baseline requirements.

Patterson argues that the Amended Plan is not fair and equitable under § 1191(b) because: (1) the fair market value asserted by the Debtor with respect to Patterson's collateral is far too low and, therefore, Patterson's secured claim should be allowed in a higher amount; (2) the Amended Plan proposes to pay Patterson over too long a period of time and at too low of an interest rate; (3) the Amended Plan will likely not be feasible if Patterson's prior two objections are sustained; (4) the Amended Plan does not provide adequate remedies; and (5) the Debtor has not established that she is committing her disposable income under the Amended Plan for at least three years.  Since the Court finds that the Amended Plan is facially nonconfirmable on the last two grounds, the first three issues—all of which are factual in nature and may require an evidentiary hearing—are preserved for future proceedings to the extent those objections endure with respect to any amended plan the Debtor may later file.

*A.  The Debtor's Disposable Income Projections*

Patterson argues that the Debtor has not established that she is committing her disposable income under the Amended Plan for at least three years.  The Debtor contends that her disposable income is irrelevant because she seeks to confirm her plan under § 1191(c)(2)(B) rather than § 1191(c)(2)(A).

4

Whether she seeks to confirm under subsection (A) or (B), however, the Debtor's projected disposable income is a critical element of the confirmation analysis. To be confirmed under § 1191(c)(2)(B), the Amended Plan must distribute property which has a value equal to, or greater than, the Debtor's projected disposable income over at least three years, or such longer period as the Court determines is appropriate. In this case, the Court cannot determine whether the property to be distributed under the Amended Plan is sufficient because the projections presented by the Debtor are inaccurate and confusing. The Amended Plan is, therefore, nonconfirmable.

Disposable income is defined as "income that is received by the debtor and that is not reasonably necessary to be expended . . . for . . . the maintenance or support of the debtor or a dependent of the debtor; or. . . a domestic support obligation that first becomes payable after the date of the filing of the petition; or . . . for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the debtor." 11 U.S.C. § 1191(d). The Debtor asserts that the "Cash on Hand after personal expenses (draw)" line in Exhibit C to the Amended Plan (D.E. 107-3) projects that she will earn $69,506.00 in disposable income in the first year of her plan, and $94,505.00 in succeeding years. Amended Plan, § B; Exh. C.[3] Although Exhibit C only shows one year of projections, the Debtor claims the projections will be the same from year-to-year; the only difference being the absence of the $25,000.00 initial plan payment in years two and three. By the Debtor's calculations, she will produce $258,515.00 in disposable income over the three-year term of the Amended Plan.

The Debtor's analysis is faulty for several reasons. The most glaring issue is that Exhibit C shows the income and expenses of the Debtor's sole proprietorship rather than *her* personal disposable income. The Debtor "disincorporated" the PA prepetition and commenced this chapter 11 case as an individual debtor. She is the debtor in this case; not the PA. In order to satisfy § 1191(c)(2)(B) she must establish her *personal* projected disposable income. The Debtor contends that cash flow projections at Exhibit C sufficiently capture her personal projected income because the "Owner's Draw" of

---

[3] Exhibit C deducts a one-time initial plan payment of $25,000.00 which will not be paid in years two and three of the Amended Plan.

$8,000.00/month (except in January and April of 2024 when she draws $10,000.00/month) is used to pay her personal expenses. Those personal expenses are not itemized anywhere on Exhibit C.

      The Court disagrees. Exhibit C does not capture the Debtor's household disposable income. The Amended Schedules I and J she filed on August 18, 2023 (D.E. 54) indicate that, after receiving business income of $7,669.28 each month, her household's net monthly income is $4,136.06. This monthly income is likely additional to any positive cash flow evidenced by Exhibit C because the business income reflected in Amended Schedule I appears to be the same "Owner's Draw" shown in the cash flow projections in Exhibit C. To the extent the Debtor argues that the income on Amended Schedule I is artificially inflated because it includes the income of her non-filing spouse, that argument ignores the fact that Amended Schedule J also includes the total household expenses. In other words, the household's income *and* expenses are jumbled into one pot in Amended Schedules I and J.

      To calculate her projected disposable income for purposes of the Amended Plan, the Debtor should file new Schedules I and J, which attach the gross receipts, ordinary and necessary business expenses, and the total monthly net income of the dental practice, as is required by Line 8a of Schedule I. The monthly net income shown on that attachment should match the amount of income shown on Line 8a of Schedule I. The new Schedule I should also show her non-filing spouse's income if the Debtor includes all household expenses on Schedule J. The decision to include or omit the non-filing spouse's income and any corresponding allocation of household expenses should reflect the economic realities of the household. The updated Schedules I and J, and the attachment showing the monthly net income of the dental practice, should accompany any future amended plan so that creditors can determine the feasibility of any newly proposed plan and determine the Debtor's projected disposable income.[4] In addition to filing updated Schedules I and J as an exhibit to an amended plan, the Debtor should also attach cash flow projections which accurately depict the income and expenses of the dental practice.

---

[4] Although this decision is focused on § 1191(c)(2)(B), the Court notes that Patterson also raised the potential of feasibility issues. Depending on the outcome of the valuation dispute concerning Patterson's collateral, the feasibility issue may require a closer examination of the Debtor's disposable income in future confirmation proceedings.

Second, the current cash flow projections set out in Exhibit C are flawed because they do not accurately establish the dental practice's projected disposable income. The first column of Exhibit C indicates beginning cash on hand in the amount of $67,354.00. Exhibit C also shows that the dental practice will generate $105,000.00 of "revenue" in the first month of the Amended Plan. During that same period, the dental practice will pay $79,939.00 in expenses, leaving a net profit of $25,061.00. The Debtor then adds this net profit to the $67,354.00 of beginning cash for a total of $92,414.00. After deducting the Owner's Draw and the Initial and Quarterly Plan Payments, the dental practice is left with $59,414.00 in cash on hand at the end of the first month. It is to this line ("Cash on Hand after personal expenses (draw)"), in the twelfth month, that the Debtor points as her projected monthly income. Therefore, the Debtor would say the ending cash balance of $59,414.00 in the first month represents her projected disposable income for October even though the dental practice is in a *worse* cash position than it was when it began the month.

The $59,414.00 in cash is then rolled forward as the beginning cash balance of the second month, to which the net profit of $15,713.00 is added before again deducting the Owner's Draw, resulting in an ending cash balance of $67,127.00. That cash balance then becomes the starting cash balance for the third month and so on and so forth until the conclusion of the twelfth month, September 2024, for which Exhibit C shows an ending cash balance of $69,506.00. This figure, however, doesn't show the dental practice's *income* during the first year of the Amended Plan but, rather, its *cash balance*. The Debtor's reference to the cash balance as "projected disposable income" misrepresents the economic reality of that line in the cash projections.

Third, the cash projections are not extended over three years. The Debtor argues that the one year of projections is sufficient because, other than the initial payment of $25,000.00, the dental practice's income and expenses do not vary from year to year. A quick review of the documents filed in this case calls that assertion into question. The Exhibit C attached to the Original Plan (D.E. 3-3) began its cash flow projections in August of 2023, which is the same month in which the Debtor filed both her petition and the Original Plan. The projections in that version of Exhibit C showed beginning cash of $9,800.00

7

for the month of August 2023, before growing steadily over the ensuing months until the dental practice ultimately realized a projected beginning cash balance of $73,668.00 in July 2024 and a projected ending cash balance for that same month of $85,346.00.  At the time she filed the Original Plan, the Debtor projected a beginning cash balance of just $21,388.00 in October of 2023.  Exhibit C to the Amended Plan—filed just two months later—indicates a beginning cash balance in October 2023 of $67,127.00, or $45,739.00 *more* than the Debtor projected for that same month in August of 2023.  Furthermore, while the cash flow projections to the Original Plan indicate steady growth in cash on hand, the projections attached to the Amended Plan indicate that the dental practice's cash position will fluctuate from month-to-month between a high of $83,247.00 and a low of $57,714.00.  At the end of the first twelve months of the Amended Plan, the dental practice's cash balance will improve by just $2,152.00.

The fluctuations can likely be attributed, at least in part, to the change in plan payments between the Original Plan and the Amended Plan which were made necessary by the increase in Patterson's Allowed Secured Claim in the Amended Plan.  Notwithstanding her claim that the dental practice's income and expenses are predictable, however, the Debtor never explains how, in the first two months of the case, her dental practice generated more than three times as much cash as she projected in her original Exhibit C.  The Monthly Operating Report filed by the Debtor on October 16, 2023 (D.E. 117) indicates that, during the month of September 2023, the dental practice generated $99,983.00 in receipts which is comparable to the $105,000.00 in "revenue" projected in the version of Exhibit C attached to the Original Plan.  The dental practice disbursed just $65,456.00 in cash, however, which is substantially less than the $96,158.00 in expenses projected on Exhibit C to the Original Plan.  This brief history suggests that the dental practice's expenses, at least, are not quite as constant or predictable as the Debtor would have creditors or this Court believe.

Furthermore, Exhibit C to the Amended Plan improperly deducts plan payments from the dental practice's profit *before* determining the Debtor's projected disposable income.  In comparing the value of property to be distributed under the Amended Plan to the Debtor's projected disposable income during the

8

commitment period for the purposes of § 1191(c)(2)(B), it makes no sense to deduct from disposable income the payments made for the benefit of creditors under the terms of the Amended Plan.

In a plan confirmed under § 1191(c)(2)(A), the Debtor would pay all of her disposable income for the benefit of all classes, including Classes One and Two.  In a plan confirmed under § 1191(c)(2)(B), the Debtor distributes property; not her disposable income.  Before confirming under this section, then, the Court must ensure that creditors are no worse off than they would be under a plan confirmed pursuant to § 1191(c)(2)(A).  Therefore, in calculating the Debtor's disposable income for the purpose of comparing that value to the value of the property to be distributed, no payments paid for the benefit of creditors under the terms of the Amended Plan should be first deducted from projected disposable income.  This approach is consistent with the wording of § 1191(d) which makes no mention of plan payments in listing the types of expenses to be deducted from a debtor's net income when determining disposable income. Since Exhibit C first deducts the plan payments before determining the Debtor's projected disposable income, the projections are inaccurate.

For the foregoing reasons, it is impossible to determine the Debtor's disposable income in a way that would allow this Court to determine whether the Debtor is proposing to distribute property at least equal in value to the Debor's disposable income over the three-year term of the Amended Plan as required by § 1191(c)(2)(B) and, therefore, confirmation must be denied.

B.    *Adequate Remedies*

Additionally, the Amended Plan cannot be confirmed because it does not satisfy § 1191(c)(3) which introduces a new wrinkle, unique to Subchapter V cases, to the concept of "fair and equitable". Under this provision, the Debtor must establish either: (1) that she will be able to make all payments under the Amended Plan; or (2) that there is a reasonable likelihood she will be able to make the payments *and* the Amended Plan provides appropriate remedies in the event claims are not paid.  11 U.S.C. § 1191(c)(3).  In order to confirm a plan, a debtor is already required to establish that confirmation is unlikely to be followed by liquidation or a need for further reorganization.  §§ 1129(b)(11), 1191(a). The inclusion of a further feasibility test in the fair and equitable standard in § 1191(c)(3), then, must

require something more.  Courts have described § 1191(c)(3) as fortification of the "more relaxed" feasibility standard set forth in § 1129(a).  In re Samurai Martial Sports, Inc., 644 B.R. 667, 698 (Bankr. S.D. Tex. 2022).  "The feasibility requirement for confirmation under § 1191(c) requires a showing that the debtor can realistically carry out its plan.  Though a guarantee of success is not required, the court should be satisfied that the reorganized debtor can stand on its own two feet."  Id.  See also, Hon. Paul W. Bonapfel, Guide to the Small Business Reorganization Act of 2019, (Rev. June 2022), https://www.ganb.uscourts.gov/sites/default/files/sbra_guide_pwb.pdf, at 156 – 160.

The original text of § 1191(c)(3) required a plan to provide adequate remedies regardless of whether the debtor satisfied the more stringent feasibility test of showing an ability to make all payments under the plan or the lesser standard of a reasonable likelihood.  That language was amended by the Bankruptcy Threshold Adjustment and Technical Corrections Act of 2022 so that now a plan need only include adequate remedies if a debtor only manages to satisfy the reasonable likelihood standard.  11 U.S.C. § 1191(c)(3)(B).

The Debtor contends that she satisfies the § 1191(c)(3)(A) standard because she is unconditionally committing to make all of the proposed plan payments and she provided projections which establish that she will have sufficient disposable income to make all of those payments.  She claims the projections are solid evidence of her projected cash flow because they are based on her 16 years of dental practice in Gorham, Maine.  As discussed above, however, the cash flow projections are flawed and, therefore, the Court does not have sufficiently accurate information to determine feasibility under either subsection (A) or (B) of § 1191(c)(3).

The Debtor contends that, even if she failed to establish feasibility under § 1191(c)(3)(A), the Amended Plan provides adequate remedies because it includes a retention of jurisdiction provision which would allow the Court to address any issues which might arise under the Amended Plan.  Since the Debtor fails to establish feasibility under even § 1191(c)(3)(B), the Court need not address this issue in detail but, for the Debtor's reference in formulating a further plan, a remedy is insufficient protection under § 1191(c)(3)(B)(ii) if it is not tailored to the specific circumstances of the plan.  Hamilton v. Curiel

(In re Curiel), 651 B.R. 548, n. 11 (9th Cir. B.A.P. 2023). Merely providing creditors with the opportunity to pursue their state law rights or to seek enforcement of a plan is insufficient. In re Channel Clarity Holdings, LLC, 2022 WL 3710602 *16 (Bankr. N.D. Ill. July 19, 2022) (finding that plan language stating that claimants would be entitled to pursue their remedies under applicable law ". . . is deficient in that it offers no specific protections for unsecured creditors who are forced to forgo some of the standard protections of a typical chapter 11 case when debtors elect to proceed under subchapter V.").

## II. Other Bases for Denial of Confirmation

Confirmation of the Amended Plan is denied for the reasons stated above. If the Debtor files a second amended plan, she should address other deficiencies which could also prove to be an impediment to confirmation. Those include:

- The Amended Plan provides that Patterson's Class One claim will be allowed in the amount of $214,400.00 or in such other amount as the Debtor and Patterson may agree upon. Amended Plan, § 3.1. The claim will be paid pursuant to a promissory note given in the amount of the Allowed Secured Claim. Id., § 4.1. This proposed treatment is too vague. A plan proponent must specify the treatment of any class of claims or interests that is impaired under the plan. 11 U.S.C. § 1123(a)(3). Without knowing how much the Debtor plans to pay out to Class One, there is no way for creditors or the Court to determine whether the Plan is either feasible or fair and equitable.

- The nature of Live Oak's claim must be clarified. The Amended Plan states in § 3.3 that the claim "is fully secured by the real estate *owned by Madison*" and the Debtor's schedules do not indicate that she owns any real property beyond her residence securing the Class Four claim and the camp securing the Class Five claim. However, § 4.3 of the Amended Plan states that Live Oak will retain its liens "in assets of the Debtor and assets of Madison VWB Realty, LLC". It is not clear whether the Live Oak claim is secured by assets of the estate. If so, the Live Oak claim is properly classified. If Madison continues to own the property, and there are no other assets securing the claim, however, then Live

11

Case 23-20168    Doc 133    Filed 12/05/23    Entered 12/05/23 09:51:00    Desc Main
Document      Page 12 of 14

- Oak's claim against the Debtor's estate pursuant to the personal guaranty is a general unsecured claim and should not be classified separately from other Class Six claims.

- The Court questions whether the Debtor's continued payments on the camp are fair and equitable when general unsecured creditors are receiving so little on their claims. The Court views a camp as a luxury rather than a necessary expenditure. If the Debtor must resort to the provision of § 1191(b) for confirmation of an amended plan, she should be prepared to explain why continued ownership of the camp does not weigh against a finding of fairness and equity.

Failure to adequately address these issues in a future amended plan might result in a finding of bad faith under § 1129(a)(3) or an adverse ruling under § 1191(b).

### III.    Treatment of Class Six Claims under 11 U.S.C. § 1191(C)(2)(B)

Patterson and the Debtor construe § 1191(c)(2)(B) very differently. The Debtor contends that the Amended Plan complies with § 1191(c)(2)(B) because the present value of the promissory notes to be issued to Classes One and Two exceed the value of the Debtor's projected disposable income over the three-year period of the Amended Plan. Patterson, however, reads the clause, ". . . with respect to *each class* of claim or interests . . ." in § 1191(c) to mean that each impaired, non-accepting class must receive property with value which is equal to or greater than the Debtor's projected disposable income. Although the Amended Plan is facially nonconfirmable on other grounds, Patterson and the Debtor asked the Court to indicate which interpretation of § 1191(c)(2)(B) is correct as that decision will materially influence the structure of an amended plan. The Court finds that the Debtor's interpretation leads to the most sensible result.

Patterson's interpretation would require a debtor to commit all of his or her disposable income, or distribute property representing that same value, to every impaired class that does not accept the plan. One cannot commit all of one's disposable income to more than one class and to require a debtor to distribute property equal to or greater in value than his or her disposable debtor to more than one class

would be overly burdensome. The only way this interpretation avoids an absurd result is if a debtor only needs to satisfy the requirements of § 1191(c)(2) with respect to just one class of claims.

In this case, Class One and Class Six are both impaired and neither class accepted the plan. If one assumes, however, that § 1191(c)(1) contains all of the requirements for classes of secured claims and § 1191(c)(2) contains the requirements for all other classes of claims or interests, then, in this case, the Debtor would need to satisfy § 1191(c)(2)(B) with respect to just Class Six. This interpretation of subsections (c)(1) and (c)(2)—which seems reasonable at first blush—would allow us, in this case, to avoid the absurd result contemplated above. There are problems with this approach, however.

First, § 1191(c)(2) is not expressly limited to a specific class of claims. The rule of construction set forth in § 1191(c) is structurally similar to the fair and equitable conditions established in § 1129(b)(2) with both schemes containing identical requirements for a class of secured creditors. §§ 1129(b)(2)(A), 1191(c)(1). While § 1129(b)(2) explicitly identifies different requirements for a class of unsecured claims in subsection (B) and a class of interests in subsection (C), subsections (c)(2) and (c)(3) of § 1191 are not similarly limited. In fact, the feasibility test set forth in subsection (c)(3) does not address the treatment of claims at all and is obviously generally applied to a plan, as a whole. If Congress sought to limit the applicability of § 1191(c)(2) to any particular class of claims, it would have included limiting language in that paragraph as it did in §§ 1129(b)(2)(A), (B), and (C). In the absence of that language, the more reasonable interpretation is that § 1191(c)(2), like § 1191(c)(3), is more globally applicable to the entire structure of the plan.

Second, unlike § 1129(b)(2)(C), § 1191(c) does not specifically address classes of interests. If we read § 1191(c)(2) to mean all other classes besides classes of secured claims, that provision would also have to include classes of interests. While extremely unlikely, it is conceivable that both a class of unsecured creditors and a class of interests could vote to reject a plan of reorganization. We would be back to the same issue of a debtor having to commit all of his or her disposable income, or distribute property of equivalent value, to more than one class.

13

The more reasoned approach, therefore, is the one suggested by the Debtor. For a plan to be fair and equitable under § 1191(c), classes of secured claims that are impaired and do not accept the plan must be treated in accordance with § 1129(b)(2)(A) and, in addition, a debtor must either pay all of her disposable income into the plan, or distribute property equal in value to that disposable income. Finally, the plan must also provide adequate remedies unless the debtor can meet the more stringent feasibility analysis.

It is possible under this interpretation of § 1191(c)(2)(B) that a debtor could pay little to general unsecured creditors, while accruing disposable income, by giving promissory notes or some other property of equal to, or greater, present value. A court does have both explicit and implicit authority to implement further measures to ensure fairness and equity, however. For instance, § 1191(c)(2) allows a court to increase the applicable commitment period from three years to as long as five years. Further, § 1191(c) states that the condition of fairness and equity *includes* the requirements set forth in subsections (1) through (3) which means, as noted earlier, a court may require something more to satisfy that condition. In light of these mitigating measures, the Court finds that the Debtor's interpretation of § 1191(c)(2)(B) leads to the most sensible result and, therefore, most likely reflects the legislative intent behind that provision.

## IV.    Conclusion

For the foregoing reasons, confirmation of the Amended Plan is hereby denied. The parties' rights with respect to other objections raised by Patterson and not addressed here will be preserved should they continue to persist with respect to a further amended plan.

Dated: December 5, 2023                                         /s/ Peter G. Cary
                                                                Judge Peter G. Cary
                                                                United States Bankruptcy Court